J-S73011-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| JAMES R. TURNER, JR. | : | |
| | : | |
| Appellant | : | No. 294 WDA 2018 |

Appeal from the PCRA Order January 30, 2018
In the Court of Common Pleas of Beaver County
Criminal Division at No(s):  CP-04-CR-0001944-2014

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and OLSON, J.

MEMORANDUM BY GANTMAN, P.J.:                 FILED: March 11, 2019

Appellant, James R. Turner, Jr., appeals from the order entered in the Beaver County Court of Common Pleas, which denied his first petition filed under the Post Conviction Relief Act ("PCRA"), at 42 Pa.C.S.A. §§ 9541-9546. We affirm.

The relevant facts and procedural history of this case are as follows.  On the night of August 14, 2014, Appellant and his girlfriend ("Victim") went to a bar.  After a few drinks, Victim left the bar and did not return, leaving Appellant behind.  Appellant obtained a ride to Victim's home and confronted Victim about leaving him at the bar.  In the course of this confrontation, Appellant repeatedly stabbed Victim in multiple parts of her body.  Appellant left Victim's home, taking her car and the knife he used to stab her.  Later, Appellant discarded the knife in the Ohio River.  The stab wounds to Victim's

left carotid artery and vein caused her to bleed out slowly and die. Appellant surrendered to police the next day, claiming he had acted in self-defense because Victim attacked him first with a knife. Evidence indicated Appellant was intoxicated when he attacked Victim, and Appellant claimed he was also intoxicated when he gave his statement to the police. On the day of Appellant's arrest, the police obtained a search warrant to collect blood samples from Appellant to compare to blood samples obtained from the scene of the attack. The Commonwealth utilized the blood samples for DNA analysis and the crime lab later destroyed them pursuant to lab protocol.

On February 12, 2016, a jury convicted Appellant of third-degree murder. The court sentenced Appellant on March 3, 2016, to twenty (20) to forty (40) years' imprisonment. On March 11, 2016, Appellant timely filed post-sentence motions, followed by numerous pro se and counseled filings and extensions of time. The court denied Appellant's post-sentence motions on November 2, 2016. On November 23, 2016, Appellant filed a petition for appointment of new counsel. On December 2, 2016, Appellant's prior counsel timely filed a notice of appeal on Appellant's behalf. Appellant filed a motion to withdraw the notice of appeal on December 9, 2016. Following a hearing on the same day, the court allowed Appellant to discontinue his direct appeal and appointed conflict counsel to pursue a PCRA petition instead. Appellant first filed a pro se petition, and new counsel filed an amended PCRA petition on June 19, 2017.

At a PCRA hearing on September 25-26, 2017, the court heard testimony from Appellant's sister, brother-in-law, son, and trial counsel. Also at the PCRA hearing, Appellant made an oral motion to reinstate his direct appeal rights nunc pro tunc, which the court denied on December 5, 2017. On January 30, 2018, the court also denied PCRA relief. Appellant filed a pro se notice of appeal on February 12, 2018. On February 15, 2018, the court ordered Appellant to file a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b). Counsel timely filed an amended notice of appeal on February 26, 2018, and a timely Rule 1925(b) statement on March 8, 2018.

Appellant raises the following issues on appeal:

> 1. WHETHER THE PRIOR LEGAL TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO TAKE ACTION TO PRESERVE, OBTAIN AND ANALYZE (A) THE SAMPLE OF [APPELLANT'S] BLOOD SEIZED BY POLICE IMMEDIATELY AFTER THE SEIZURE OF [APPELLANT'S] INCULPATORY STATEMENT TO POLICE AND (B) THE FOOTAGE OF VIDEO SURVEILLANCE OF [APPELLANT] ENTERING AND EXITING THE POLICE STATION IMMEDIATELY BEFORE AND AFTER THE POLICE SEIZURE OF [APPELLANT'S] INCULPATORY STATEMENT FOR ADMISSION TO CORROBORATE [APPELLANT'S] INTOXICATED AND CONFUSED STATE ON THE ISSUE OF WHETHER IT WAS A KNOWING, INTELLIGENT AND VOLUNTARY STATEMENT?
>
> 2. WHETHER PRIOR LEGAL TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MARSHAL AND INTRODUCE, DURING BOTH (A) A HEARING TO SUPPRESS AND (B) TRIAL, AVAILABLE EVIDENCE FROM AT LEAST THREE WITNESSES IN THE COMPANY OF [APELLANT] IMMEDIATELY PRIOR TO THE POLICE SEIZURE OF [APPELLANT'S] STATEMENT AS TO [APPELLANT'S] INTOXICATED AND CONFUSED STATE ON THE ISSUE OF

WHETHER IT WAS A KNOWING, INTELLIGENT AND VOLUNTARY STATEMENT?

3. WHETHER PRIOR LEGAL TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE TO SUPPRESS OR PROHIBIT THE EVIDENTIARY USE AT TRIAL OF ANY EVIDENCE INVOLVING THE ANALYSIS OF [APPELLANT'S] BLOOD SEIZED BY POLICE FOR A VIOLATION OF [APPELLANT'S] FEDERAL AND STATE CONSTITUTIONAL DUE PROCESS RIGHTS OF MEANINGFUL OPPORTUNITY TO PRESENT A DEFENSE?

4. WHETHER PRIOR LEGAL TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO ALL TESTIMONY OF THE COMMONWEALTH FORENSIC PATHOLOGIST NOT EXPLICITLY CONTAINED WITHIN HIS EXPERT AUTOPSY REPORT, ESPECIALLY HIS EXPERT OPINIONS THAT THE DECEDENT WAS UNCONSCIOUS AND PRONE WHILE STABBED MULTIPLE TIMES?

5. WHETHER PRIOR LEGAL TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MARSHAL, LOCATE, SECURE THE ATTENDANCE OF, AND INTRODUCE TESTIMONY OF AVAILABLE WITNESSES AND OTHER CHARACTER EVIDENCE OF THE DECEDENT'S VIOLENT PROPENSITIES IN GENERAL AND A SPECIFIC STATEMENT OF INTENTION OF VIOLENCE TOWARD [APPELLANT]?

6. WHETHER PRIOR LEGAL TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO REQUEST A JURY INSTRUCTION OF AN ADVERSE INFERENCE FROM THE DESTRUCTION OF [APPELLANT'S] BLOOD SEIZED BY POLICE AND THE POLICE VIDEO AS IT RELATES TO BOTH (A) WHETHER [APPELLANT'S] INCULPATORY STATEMENT TO POLICE WAS KNOWING, INTELLIGENT AND VOLUNTARY, AND (B) WHETHER [APPELLANT] WAS CAPABLE OF FORMING A SPECIFIC INTENT TO KILL?

7. WHETHER PRIOR LEGAL TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO REQUEST A JURY INSTRUCTION TO THE EFFECT THAT A DEFENDANT CANNOT BE FOUND TO HAVE ACTED WITH MALICE UNLESS IT FINDS THAT THE VICTIM'S INJURIES WERE CAUSED BY THE DEFENDANT'S INTENTIONAL AND VOLUNTARY

ACTION(S)–INVOLUNTARY ACTION IS NOT SUFFICIENT?

(Appellant's Brief at 4-5).[1]

Our standard of review of the denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error. Commonwealth v. Conway, 14 A.3d 101 (Pa.Super. 2011), appeal denied, 612 Pa. 687, 29 A.3d 795 (2011). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. Commonwealth v. Boyd, 923 A.2d 513 (Pa.Super. 2007), appeal denied, 593 Pa. 754, 932 A.2d 74 (2007). We give no such deference, however, to the court's legal conclusions. Commonwealth v. Ford, 44 A.3d 1190 (Pa.Super. 2012). Traditionally, credibility issues are resolved by the trier of fact who had the opportunity to observe the witnesses' demeanor. Commonwealth v. Abu-Jamal, 553 Pa. 485, 720 A.2d 79 (1998), cert. denied, 528 U.S. 810, 120 S.Ct. 41, 145 L.Ed.2d 38 (1999). Where the record supports the PCRA court's credibility resolutions, they are binding on this Court. Id.

Pennsylvania law presumes counsel has rendered effective assistance.

_____

[1] In his PCRA petitions, Appellant failed to raise any claim of trial counsel's ineffectiveness for failure to move to suppress or preclude the Commonwealth's use of any evidence involving the analysis of Appellant's blood sample. Thus, Appellant's third issue is waived. See Commonwealth v. Williams, 909 A.2d 383, 386 (Pa.Super. 2006) (holding issues not raised in PCRA petition are waived on appeal); Commonwealth v. Brown, 767 A.2d 576, 585 (Pa.Super. 2001) (stating same).

Commonwealth v. Williams, 597 Pa. 109, 950 A.2d 294 (2008). When asserting a claim of ineffective assistance of counsel, the petitioner is required to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and, (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. Commonwealth v. Kimball, 555 Pa. 299, 724 A.2d 326 (1999). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. Williams, supra.

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit...." Commonwealth v. Pierce, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994). "Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." Commonwealth v. Poplawski, 852 A.2d 323, 327 (Pa.Super. 2004).

> Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests. If we conclude that the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective.

Pierce, supra at 524, 645 A.2d at 194-95 (internal citations omitted).

> Prejudice is established when [an appellant] demonstrates that counsel's chosen course of action had an adverse effect on the outcome of the proceedings. The [appellant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

outcome. In [Kimball, supra], we held that a "criminal [appellant] alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

Commonwealth v. Chambers, 570 Pa. 3, 21-22, 807 A.2d 872, 883 (2002) (some internal citations and quotation marks omitted).

Regarding Appellant's issues one, two, four, five, and seven, after a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable James J. Ross, we conclude these issues merit no relief. The PCRA court opinion comprehensively discusses and properly disposes of the questions presented (See PCRA Court Opinion, dated January 30, 2018, at 20-29) (finding: Appellant's complaints of trial counsel's ineffectiveness for failing to preserve, obtain, and analyze blood sample, to obtain surveillance video, and to request jury instruction on involuntariness defense lacked arguable merit and counsel's strategy cannot be challenged simply by comparing in hindsight trial strategy employed with alternatives not pursued; claims of counsel's failure to call Appellant's relatives as witnesses, counsel's failure to object to certain testimony of pathologist, and counsel's failure to utilize evidence of Victim's propensity for violence were explained by counsel's reasonable trial strategy). Accordingly, as to issues one, two, four, five, and seven, we affirm on the basis of the PCRA court's opinion.

In Appellant's remaining issue (six), Appellant argues trial counsel failed to request an adverse inference instruction relating to the destruction of

Appellant's blood sample and the police station surveillance video. Appellant avers counsel should have requested an instruction specifically addressing the loss of this evidence to allow the jury to infer that the missing evidence would have been unfavorable to the Commonwealth and favorable to Appellant. Appellant alleges an adverse inference instruction could have partially mitigated counsel's initial failure to obtain, preserve, and analyze the blood sample and to obtain the video. Appellant concludes this Court should "arrest judgment on the count of Murder−3° and grant him a new trial." (See Appellant's Brief at 47.) We disagree.

"Under Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] and subsequent decisional law, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature." Commonwealth v. Roney, 622 Pa. 1, 22, 79 A.3d 595, 607 (2013), cert. denied, ___ U.S. ___, 135 S.Ct. 56, 190 L.Ed.2d 56 (2014). "To establish a Brady violation, an appellant must prove three elements: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued." Id. When the Commonwealth fails to preserve "potentially useful" evidence, as opposed to "materially exculpatory" evidence, no due process violation occurs unless the defendant can prove the Commonwealth acted in bad faith. Commonwealth v.

Chamberlain, 612 Pa. 107, 30 A.3d 381 (2011), cert. denied, 566 U.S. 986, 132 S.Ct. 2377, 182 L.Ed.2d 1017 (2012). "Potentially useful evidence is that of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Id. at 143, 30 A.3d at 402 (internal quotations marks omitted).

Instantly, Appellant wanted to use both the blood sample and the police station video to show he was intoxicated when he gave his inculpatory statement to police. The video surveillance and the blood evidence obtained from Appellant at the time of his statement, however, were only "potentially useful," as the evidence could have been subjected to tests that might have assisted in Appellant's defense. See id. Because the evidence was potentially useful at best, Appellant was required to show that the Commonwealth acted in bad faith regarding the destruction of the evidence at issue. See id. Here, Appellant failed to submit any evidence that the Commonwealth acted in bad faith or to contradict the assertions that the video evidence was recycled in due course. Trial counsel indicated only that by the time he requested the video surveillance, it was no longer available.

As for the blood samples, the Commonwealth utilized them for DNA analysis, whereas Appellant wanted the blood samples to show he was inebriated when he made his statement to the police. The crime lab, however, disposed of the blood samples pursuant to lab protocol, which provided for specimens to be retained for thirty days. The blood evidence might have been

"potentially useful" but, absent more, the evidence was not "materially exculpatory." Appellant failed to prove any due process violation occurred as a result of the disposal of the blood evidence. See id.

As to the potential to use the evidence to demonstrate Appellant's incapacity to form the specific intent to kill, we observe the jury convicted Appellant of third-degree murder, which does not require the specific intent to kill. See Commonwealth v. Clemons, ___ A.3d ___, 2019 WL 286565 (Pa. filed January 23, 2019) (reiterating voluntary intoxication for diminished capacity purposes serves only to reduce first-degree murder to third-degree murder); Commonwealth v. Reed, 583 A.2d 459 (Pa.Super. 1990), appeal denied, 528 Pa. 629, 598 A.2d 282 (1991) (explaining evidence of voluntary intoxication may reduce first-degree murder to third-degree murder, but cannot reduce third-degree murder to manslaughter). Appellant's voluntary intoxication had already been used to mitigate the specific intent to kill. Thus, Appellant's claim regarding an adverse inference instruction related to the surveillance video and blood samples lacks arguable merit. Because Appellant's underlying claim lacks arguable merit, he fails to meet the first prong of the test for ineffective assistance of counsel. See Williams, supra; Kimball, supra; Pierce, supra. Therefore, counsel cannot be deemed on PCRA review as ineffective for failing to pursue a meritless claim and Appellant's sixth issue warrants no relief. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/11/2019

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :
:
vs. : No. 1944-2014
:
JAMES R. TURNER, JR. :

ROSS, J.                                     January 30, 2018

## MEMORANDUM OPINION

## INTRODUCTION

Defendant, James R. Turner, Jr., was charged in this case with a general charge of homicide, and a jury trial was held on that charge before this Court in February, 2016. On February 12, 2016, the jury entered a guilty verdict of third degree murder against defendant. On March 3, 2016, this Court sentenced defendant to 20-40 years in a state correctional facility. Post-sentence motions were timely filed, and this Court addressed all post-sentence motions in an Opinion and Order dated November 2, 2016, which denied all of the points raised by defendant in his motions.

On November 23, 2016, defendant filed a *pro se* petition requesting that the Court dismiss his trial counsel, that the Court appoint new counsel for him and that he be permitted to withdraw his direct appeal to the Pennsylvania Superior Court and pursue a Post-Conviction Relief Act (hereinafter "PCRA") petition instead.

Trial counsel timely filed a notice of appeal with the Clerk of this Court on December 2, 2016. The Court ordered that defendant be transported from his state correctional facility and brought before this Court on December 9, 2016. At that hearing, the Court conducted a lengthy colloquy with defendant, advising him of all of his rights in connection with the direct appeal and the dangers associated with withdrawing the

appeal and pursuing only a PCRA petition. After the colloquy was completed and defendant was given the opportunity to have private consultation with his trial counsel, defendant expressly stated that he understood all of his rights, that he desired his trial counsel withdraw his direct appeal and that he only desired that new counsel be appointed to pursue a PCRA petition.

In light of the foregoing, this Court entered an Order on December 9, 2016, acknowledging that defendant wanted his direct appeal withdrawn, which was in fact done, and ordering that conflicts counsel be appointed to pursue a PCRA petition on defendant's behalf upon discontinuance of the direct appeal.

By subsequent Order, the Court appointed conflicts counsel, who was permitted to supplement the PCRA petition previously filed by the defendant *pro se*. The Court scheduled a hearing on the PCRA petition for Monday, September 25 and Tuesday, September 26, 2017. At that hearing, the Court received evidence and testimony with regard to the issues raised in the PCRA petitions. Also at that hearing, there was a discussion concerning defendant's waiver of his direct appeal rights before the Court on December 9, 2016. At that hearing, new counsel for defendant made an oral motion for reinstatement of the direct appeal rights. The Court permitted both counsel to brief that issue, and the Court received the briefs of the parties.

After considering the briefs of the parties and applicable law, the Court addressed the issue of reinstatement of defendant's appeal rights in a Memorandum Opinion and Order of December 5, 2017. In that Opinion and Order, the Court denied the oral motion for reinstatement of defendant's appeal rights, finding that defendant made a knowing, voluntary and intentional decision to withdraw those rights.

-2-

In this Memorandum Opinion, the Court will address the defendant's PCRA petitions. Based upon the discussion below, the Court will deny the petitions.

## TESTIMONY AT TRIAL

At the trial of this case, Melissa Lay testified as a Commonwealth witness. She testified that her mother was Patricia Thompson, who went out for drinks in the evening hours of August 14, 2014. (See pp. 55-57 of Vol. III of trial transcript). Ms. Lay came home in the early morning hours of August 15, 2014 and found her mother dead on the kitchen floor with a pool of blood surrounding her. (See pp. 67-69 of Vol. III of trial transcript). Ms. Lay testified that there were signs of a struggle in the kitchen (See p. 85 of Vol. III of trial transcript), and Ms. Lay called 911. (See pp. 78-79 of Vol. III of trial transcript).

Captain Douglas Edgel of the Aliquippa Police Department testified as a Commonwealth witness. Captain Edgel testified that he received a call from 911 and arrived at the scene. Upon arrival, he found the body of Patricia Thompson dead in the kitchen area of the residence. (See pp.95-98 of Vol. III of trial transcript).

Another Commonwealth witness, Tyrone Reddick, testified that he was at Dave's Bar in Aliquippa during the evening hours of August 14, 2014. Defendant James Turner requested a ride home, and Mr. Reddick drove Mr. Turner to Patricia Thompson's residence. On the ride home, defendant Turner stated "I should beat that bitch's ass." (See p. 13 of Vol. IV of trial transcript).

Dr. James Smith was called as a Commonwealth witness. He is a forensic pathologist, who testified that the cause of Patricia Thompson's death was blood loss. (See p. 103 of Vol. V of trial transcript). Dr. Smith testified that there were eight stab wounds to Ms. Thompson's neck, all contained within a limited area. (See pp. 105-06 of

-3-

Vol. V of trial transcript). While testifying and referring to autopsy photographs, specifically Exhibit 62, Dr. Smith stated as follows:

> Sometimes we see areas where it appears as though a knife may have penetrated the same wound twice or a knife sometimes is partially withdrawn and then plunged down again causing the wound to be much bigger than the width of the blade of the knife.

(See pp. 105-106 of Vol. V of trial transcript).

Dr. Smith further testified that the victim was unconscious at the time she was stabbed based upon his assessment of the evidence. (See p. 107 of Vol. V of trial transcript). Dr. Smith found no defensive wounds on the victim during the autopsy or through the photographs. (See p. 108 of Vol. V of trial transcript). Dr. Smith further testified that the assailant was moving around and stabbing from different directions. He specifically stated that any one of the wounds could have been fatal. Dr. Smith also testified that there were stab wounds to the carotid artery, which supplies blood to the brain. (See p. 109 of Vol. V of trial transcript). He opined that these wounds were inflicted while the victim was unconscious. (See p. 107 of Vol. V, Trial Transcript).

When referring to Exhibit 63 (a photograph of the victim), Dr. Smith noted three stab wounds to the victim's scalp, which were not life threatening. (See p. 112 of Vol. V of trial transcript). Referring to Exhibit 65 (a photograph), Dr. Smith noted two wounds to the back of the victim which were superficial slashing wounds. (See p. 115 of Vol. V of trial transcript).

Dr. Smith also referred to Exhibit 62 (a photograph) and noted blunt force trauma behind Patricia Thompson's left eye. (See p. 117of Vol. V of trial transcript). Dr. Smith noted blunt force trauma to the victim's ear when reviewing Exhibit 69 (a photograph). (See p. 122 of Vol. V of trial transcript). Finally, Dr. Smith testified that the

cause of Patricia Thompson's death was bleeding from the carotid artery secondary to knife wounds. According to Dr. Smith's testimony, the "manner of death was homicide." (See p. 124 of Vol. V of trial transcript).

The defendant testified in his own behalf at trial. He testified that his wife died in 2013 and that he moved around that time from Oklahoma City, Oklahoma, to Aliquippa. In 2014, Mr. Turner established a relationship with Patricia Thompson. (See p. 170 of Vol. V of trial transcript). Mr. Turner stated that he lived with Patricia Thompson at her Aliquippa residence while he restored a house of his own in Aliquippa. (See pp. 176-77 of Vol. V of trial transcript).

Turner stated that on the evening of August 14, 2014, he went to Dave's Bar in Aliquippa with Patricia Thompson. (See p. 186 of Vol. V of trial transcript). He went on to state that both he and the victim, Patricia Thompson, had drinks at Dave's Bar and that the victim left Dave's Bar and did not return. Mr. Turner was left behind. (See pp. 186-88 of Vol. V of trial transcript). Mr. Turner confirmed that Tyrone Reddick took him to Patricia Thompson's home, but he cannot recall the time that he went there. (See p. 190 of Vol. V of trial transcript).

Defendant Turner stated that when he got home, Patricia Thompson was sitting at the kitchen table and smoking crack cocaine. (See p. 193 of Vol. V of trial transcript). Defendant Turner claims that Patricia Thompson attacked him in the kitchen when she came at him with a knife. (See p. 197 of Vol. V of trial transcript). Turner stated that there was a struggle during which he wrestled the knife from the victim, and both he and the victim fell to the floor. Mr. Turner admitted to stabbing Patricia Thompson in the back. (See pp. 199-204 of Vol. V of trial transcript).

Turner stated that he then left the residence, taking the knife and Patricia Thompson's car, and traveled to the North Side of Pittsburgh to see a friend. (See pp. 205-06 of Vol. V of trial transcript). Turner testified that he was not able to reach the friend in Pittsburgh and began to drive back to Aliquippa. (See pp. 207-08 of Vol. V of trial transcript).

Mr. Turner stated that on his way back to Aliquippa, he ran out of gas in Sewickley, Pennsylvania, in the morning hours of August 15 and began to walk to his sister's residence in Moon Township. While walking across the Sewickley Bridge, he threw a towel that he was carrying and the knife into the Ohio River and continued to walk to his sister's residence, where he showered. (See pp. 209-11 of Vol. V of trial transcript).

When questioned about the struggle, defendant Turner stated that he acted in self-defense because he believed he would be killed. (See pp. 13-14 of Vol. VI of trial transcript). On cross-examination, defendant Turner conceded that he did not seek help for the victim after the incident. (See p. 37 of Vol. VI of trial transcript). Also on cross-examination, Turner confirmed that he threw the knife off the bridge into the Ohio River. (See p. 39 of Vol. VI of trial transcript).

During the jury charge, the Court charged the jury, at page 45 of Vol. VII of the trial transcript, that it could find that the use of a deadly weapon to a vital organ of the body can supply the requisite malice for a conviction on third degree murder. The Court defined malice for the jury as taking action while consciously disregarding a serious risk, thereby demonstrating an extreme indifference to the value of human life. (See p. 44 of Vol. VII of trial transcript). The jury returned a verdict of guilty on third degree murder on February 12, 2016.

-6-

## FACTS AND EVIDENCE ADDUCED AT THE PCRA HEARING
## HELD ON SEPTEMBER 25 and 26, 2017

The Court conducted a hearing on defendant's PCRA petitions on Monday, September 25 and Tuesday, September 26, 2017. There were multiple witnesses who testified at that hearing. The Court will set forth the relevant testimony by each witness in separate subsections below.

### 1. Lori Turner-Williams

Lori Turner-Williams is the defendant's sister. She lives in Moon Township and is employed by Allegheny County. (See pp. 12-13 of Vol. I, PCRA transcript). She confirmed that the defendant was at her residence on August 15, 2014, the date of the incident in question. (See p. 16 of Vol. I, PCRA transcript). Ms. Turner arrived home from work at around 1:00 p.m. and found the defendant sleeping on the couch in her house. (See p. 19 of Vol. I, PCRA transcript). She saw a pill bottle on the table and once the defendant woke up, he appeared intoxicated/disoriented. (See pp. 20-21 of Vol. I, PCRA transcript).

Ms. Williams testified that she and her husband, Major Williams, drove the defendant from her residence in Moon Township to his residence in Aliquippa, Beaver County, on August 15, 2014. En route to the defendant's residence, they stopped to buy him a 40 oz. beer. Ms. Williams testified that she made no complaints about buying him beer, even though the defendant was intoxicated and disoriented. (See pp. 24-25 of Vol. I, PCRA transcript). Ms. Williams testified that after she and her husband dropped defendant off at his residence, she went to her daughter's home in Aliquippa, stayed there for a while and never saw the defendant again that day. (See pp. 25-26 of Vol. I, PCRA transcript).

-7-

Williams stated that she never spoke to the defense lawyers about what she saw. (See p. 27 of Vol. I, PCRA transcript). Ms. Williams further stated that she was available to testify throughout the proceedings in this case regarding her observations on August 15, 2014. (See p. 29 of Vol. I, PCRA transcript). She also testified that she heard the victim, Patricia Thompson, say on one occasion to the defendant, "You are not going to kill me, I'm going to kill you." (See p. 30 of Vol. I, PCRA transcript).

On cross-examination, Williams admitted that she never went to the lawyers to tell them what she saw. She was confronted with her signed statement to the police, which revealed that some of the things that she testified to were not in the police statement. (See pp. 34-36 of Vol. I, PCRA transcript). She also admitted that she never went to the lawyers to tell them what she knew. (See pp. 29 and 39 of Vol. I, PCRA transcript). Williams also admitted that police detectives questioned her on August 16, 2014. (See p. 37 of Vol. I, PCRA transcript).

2. **Major Williams**

Major Williams is the husband of Lori Turner-Williams and the brother-in-law of the defendant. He testified that he did not work on August 15, 2014. (See p. 53 of Vol. I, PCRA transcript). Major Williams stated that the defendant came to his residence on that date, at which time the defendant looked stunned. (See p. 55 of Vol. I, PCRA transcript). Mr. Williams testified that he was with the defendant throughout the day and that the defendant drank beer and took pills most of the day. (See pp. 56-57 of Vol. I, PCRA transcript). According to Williams, the defendant was disoriented. (See p. 58 of Vol. I, PCRA transcript).

Williams stated that, while the defendant was at his residence, he left to go to Pittsburgh to pick up his wife from work. She was to finish work at 1:00 p.m. that day.

-8-

The defendant was sleeping on the couch at the Williams' residence when Williams left. (See pp. 59-60 of Vol. I, PCRA transcript). Williams also testified that the defendant was high and exhibited slurred speech when he (Williams) returned from his trip to Pittsburgh. (See pp. 61-62 of Vol. I, PCRA transcript). Williams testified that he drove the defendant home on August 15, 2014 and en route bought him two 40 oz. beers. (See p. 63 of Vol. I, PCRA transcript).[1]

Williams drove the defendant to a residence and picked him up at a later point in the day to take him to the Aliquippa police station. At the time he picked the defendant up, the defendant was still intoxicated according to Williams. (See pp. 69-71 of Vol. I, PCRA transcript). Williams stated that the defendant was still drinking beer and taking pills at that time, and the defendant still exhibited signs of intoxication. (See pp. 71-72 of Vol. I, PCRA transcript).

Major Williams also testified that he was questioned by the detectives and told them that the defendant was intoxicated on the date of the incident. (See p. 75 of Vol. I, PCRA transcript). Williams testified that he also heard the victim threaten the defendant, quoting the same words and the same incident as those used by his wife, namely that the victim said to the defendant, "You're not going to kill me, I'm going to kill you." (See p. 77 of Vol. I, PCRA transcript). Williams stated he would have testified if called. (See p. 78 of Vol. I, PCRA transcript).

Finally, at the end of cross-examination, Major Williams became confrontational with the Assistant District Attorney and had to be escorted out of the courtroom by the Sheriff at the conclusion of his testimony. (See pp. 85-89 of Vol. I, PCRA transcript).

---

[1] The Court notes that this testimony is inconsistent with the testimony of Lori Turner-Williams, who testified that only one 40 oz. beer was purchased. The Court questions why any rational person would buy an allegedly intoxicated person 80 oz. of beer.

-9-

### 3. **Jamie Turner**

Jamie Turner is the defendant's son. (See p. 94 of Vol. I, PCRA transcript). Jamie Turner stated that he was stopped by the Hopewell Police on August 15, 2014 and advised that he was a suspect in the murder. The police released him after discovering they had the wrong individual. (See pp. 101-102 of Vol. I, PCRA transcript). Jamie Turner accompanied Lori Turner-Williams and Major Williams, his aunt and uncle, to the defendant's residence on August 15th to pick him up and drive him to the police station. According to Turner, the defendant reeked of alcohol and was drinking beer. (See pp. 108-09 of Vol. I, PCRA transcript). Jamie Turner stated that he had to help his father out of the house and to the car, because his father was stumbling, and had to help his father out of the car at the police station for the same reason. (See pp. 110-12 of Vol. I, PCRA transcript).

Jamie Turner stated that he told defense counsel about his father's condition and was willing to testify to that condition if called. (See pp. 116-17 of Vol. I, PCRA transcript). When confronted with a statement signed for present defense counsel at the PCRA proceeding, it was established on cross-examination that Jamie Turner did not say the same things in the statement. At this point it should be noted that Jamie Turner stated that he, his aunt and uncle, and the defendant were all in the car and they took the defendant to the police station. (See pp. 124-25 of Vol. I, PCRA transcript). This testimony should be compared and contrasted with the testimony of Lori Turner-Williams cited above, in which she stated that she stayed at her daughter's house while Major Williams left that residence to drive defendant to the police station, leaving her behind. She stated that she never saw the defendant again that day, but went to the police station later and learned that the defendant was already in the station. In other

-10-

words, she was not in the car when the defendant was taken to the police station by Major Williams. (See pp. 25-26 of Vol. I, PCRA transcript). Major Williams also confirmed that Lori Turner-Williams was not in the car when the defendant was taken to the police station on August 15, 2014. (See pp. 68-69 of Vol. I, PCRA transcript).

4. **Frank Paganie**

Frank Paganie is an Assistant Beaver County Public Defender, who has worked in that office for six years. (See p. 129 of Vol. I, PCRA transcript). He was assigned to represent the defendant and had his first meeting with the defendant at the Beaver County Jail shortly after the defendant's arrest. (See p. 132 of Vol. I, PCRA transcript). At the time Mr. Paganie was assigned to this case, he had never handled a homicide case, but had tried 3-4 cases to jury verdict. (See pp. 133-34 of Vol. I, PCRA transcript). There was a second attorney, William Braslawsce, who assisted Mr. Paganie.

Early on in the case, after meeting with the defendant at the jail, the defense team determined that it was appropriate to pursue a self-defense theory. (See p. 135 of Vol. I, PCRA transcript). Paganie requested discovery from the Commonwealth by discovery letter, which was admitted into evidence as defense Exhibit C at the PCRA hearing. (See pp. 138-40 of Vol. I, PCRA transcript). As a result of the discovery request, the defense received a tape recording of defendant's statement to the police on August 15, 2014. (See p. 141 of Vol. I, PCRA transcript). In that statement, the defendant gave differing versions of the events. (See p. 142 of Vol. I, PCRA transcript). Mr. Paganie determined it was appropriate to move to suppress the statement on the basis that the defendant was not in a proper condition to give the statement due to intoxication. Accordingly, he filed a suppression motion. (See p. 143 of Vol. I, PCRA transcript).

-11-

The defendant did advise Paganie that other people witnessed his condition, namely Lori Turner-Williams, Major Williams and Jamie Turner. (See pp. 144-45 of Vol. I, PCRA transcript). Paganie advised that he did not interview these individuals for purposes of asking them to testify, but admitted that these individuals told him that the defendant was intoxicated. (See pp. 146-47 of Vol. I, PCRA transcript). Paganie admitted that it would have been beneficial to keep defendant's different versions of the events in his statement from the jury and that this served as his reason for filing the suppression motion. (See p. 149 of Vol. I, PCRA transcript).

Paganie stated that he did not think it was a good idea to call these witnesses because they were with the defendant for an extended period of time while he (the defendant) was being sought by, and potentially avoiding, the police. Paganie thought this would be a negative for the defendant. (See p. 150 of Vol. I, PCRA transcript).

Paganie did state that the defendant wanted all three witnesses called, but Paganie believed the witness' account of the events sounded rehearsed and almost identical. (See p. 152 of Vol. I, PCRA transcript). Paganie believed that Major Williams and Jamie Turner were very passionate about the defendant and felt their judgment could be clouded. (See pp. 154-55 of Vol. I, PCRA transcript). Paganie also stated that he did not view the video surveillance at the police station to see if it captured the defendant's ability to walk, etc. (See p. 155 of Vol. I, PCRA transcript). Jamie Turner told Attorney Paganie that the defendant took four pills and drank beer. (See p. 156 of Vol. I, PCRA transcript).

Attorney Paganie was questioned about the autopsy report in this case, which was admitted into evidence as defense Exhibit E at the PCRA hearing. (See p. 159 of Vol. I, PCRA transcript). Paganie admitted that there is nothing in the autopsy report that

-12-

states that the victim was stabbed while unconscious. (See pp. 160-61 of Vol. I, PCRA transcript). Paganie stated that he was surprised when Dr. James Smith, the forensic pathologist, testified to this. (See p. 163 of Vol. I, PCRA transcript). Paganie admitted that he did not object to or challenge this testimony in court. (See p. 166 of Vol. I, PCRA transcript). Paganie stated that he did not challenge the testimony because he thought the wounds were throughout the body and not concentrated, thereby indicative of a struggle. Specifically, Paganie testified that the wounds went from the lower back to the top of the head of the victim, as well as to the neck. (See pp. 170-71 of Vol. I, PCRA transcript). Paganie stated that if the victim was knocked unconscious there was no need to have wounds all over her body, and that the blood all over the body and the scene confirmed a struggle. (See p. 172 of Vol. I, PCRA transcript). Paganie stated that he believed he cross-examined Dr. Smith on these issues. (See p. 173 of Vol. I, PCRA transcript).[2]

Attorney Paganie testified that he did not object to Dr. Smith's testimony that the cause of death was homicide because he believed Dr. Smith was allowed to testify to this. According to Paganie, homicide simply means killing. (See pp. 180-81 of Vol. I, PCRA transcript).

There were vials of blood taken from the defendant on the date of his arrest. The vials of blood were destroyed after testing at the Pennsylvania State Police Crime Laboratory. Attorney Paganie admitted that the defendant asked that the vials of blood be preserved because of his state of intoxication. (See pp. 183-85 of Vol. I, PCRA transcript). Paganie stated that he wanted to have the blood tested for both alcohol

---

[2] The clear inference that arises from the Paganie testimony is that Paganie did not object to this testimony because, in Paganie's mind, the testimony was not consistent with the evidence, and Paganie wanted to challenge it on cross-examination rather than to object to its admission.

-13-

content and any other substances that the defendant may have had in his body. Paganie stated that he did not have this opportunity because the vials of blood were destroyed on November 26, 2014, the defendant was not arraigned until December 2, 2014 and he (Paganie) could not make the discovery request until after arraignment. (See pp. 187-89 . of Vol. I, PCRA transcript). Paganie also stated that he did not even know who was in possession of the blood evidence until April 2015. (See p. 191 of Vol. I, PCRA transcript).

With regard to the assertions by Lori Turner-Williams and Major Williams, that the victim had previously made threatening comments about the defendant ("I'm going to kill you"), Paganie said that he did not put these two individuals on the stand because, in his estimation, they were close family members and not credible witnesses. (See pp. 194-95 of Vol. I, PCRA transcript). Paganie acknowledged that the defendant did not make a good witness on his own behalf at trial, but Paganie still chose not to put these individuals on the stand because of their credibility issues. (See p. 197 of Vol. I, PCRA transcript).

On cross-examination, Paganie stated that the clear theory of defense in this case was self-defense. (See p. 202 of Vol. I, PCRA transcript). Paganie discussed with the defendant testifying on his own behalf, with regard to the self-defense theory, early on. (See p. 203 of Vol. I, PCRA transcript). Moreover, once Paganie learned that the vials of blood had been destroyed, he filed a motion to quash the first degree murder charge. (See p. 206 of Vol. I, PCRA transcript). Paganie also moved to suppress the defendant's statement to the police on the basis of intoxication and requested that the Court give an instruction to the jury on intoxication as a defense to first degree murder. (See pp. 208-10 of Vol. I, PCRA transcript).

With regard to strategy, Paganie stated on cross-examination that he requested the blood vials in a discovery motion. (See pp. 6-7 of Vol. II, PCRA transcript). That discovery motion was admitted into evidence at the PCRA hearing as Commonwealth Exhibit 4.

With regard to the pre-trial motions, Paganie testified that he had the defendant testify to the issue of intoxication, rather than Lori Turner-Williams, Major Williams and Jamie Turner, because he believed that the defendant was more credible than these other individuals. Paganie also stated that he believed that the testimony of the other witnesses was too similar and appeared fabricated. (See pp. 7-8 of Vol. II, PCRA transcript).

Paganie stated that he tried to secure any video surveillance tape of the Aliquippa police station but was not successful. (See pp. 8-9 of Vol. II, PCRA transcript).

Paganie did secure the services of an investigator to try to obtain records regarding the victim's history of aggressive behavior. The investigator was not able to find anything worth using. (See pp. 9-10 of Vol. II, PCRA transcript).

Paganie further testified that he hired a forensic toxicologist to establish that there was both cocaine and alcohol in the victim's system, and this toxicologist gave opinions at trial as to the effect of the combination of these substances on an individual. (See pp. 14-15 of Vol. II, PCRA transcript). He intended to use this testimony along with the defendant's testimony to verify that a struggle occurred. (See p. 16 of Vol. II, PCRA transcript). The defendant also testified to his intoxication to challenge that the statement he gave at the police station was voluntary. (See p. 16 of Vol. II, PCRA transcript).

-15-

Paganie testified that he did request jury instructions on the failure to produce evidence and voluntary intoxication from the Court. (See p. 18 of Vol. II, PCRA transcript). Paganie stated that he thought the Commonwealth's destruction of the vials of blood in November of 2014 was completely wrong and would have challenged the destruction in a direct appeal, but the defendant's insistence that Paganie withdraw the direct appeal voided the ability to make such a challenge. (See p. 19 of Vol. II, PCRA transcript).

On re-direct examination, Paganie was questioned about two Aliquippa police reports involving the police investigation of incidents in which the victim, Patricia Thompson, was the subject. Paganie did not use these reports because they were both remote (2008) and involved property damage and not injuries to persons. (See pp. 22-25 of Vol. II, PCRA transcript). Paganie was also questioned about medical records that he had seen or secured involving a diagnosis of the victim's depression. Paganie stated that he did not use these records because his understanding and research indicated that depression does not equate to aggressive behavior. (See pp. 28-30 of Vol. II, PCRA transcript).

## 5.   James Turner

The defendant testified on his own behalf. He began his testimony by stating his understanding that a PCRA petition is different from a direct appeal. (See p. 38 of Vol. II, PCRA transcript). The defendant stated that he filed his own PCRA petition initially through his own due diligence. (See pp. 38-39 of Vol. II, PCRA transcript).

With regard to this case, the defendant stated that he met with Attorneys Paganie and Braslawsce at the Beaver County Jail approximately 72 hours after the incident and before the preliminary hearing. (See p. 40 of Vol. II, PCRA transcript). The defendant

-16-

testified that he has a Bachelor of Science in electrical engineering from Point Park University. He had important engineering jobs over the years. He stated that he was both well-educated and honorably discharged from the military. (See pp. 42-46 of Vol. II, PCRA transcript). This testimony was evidently elicited for purposes of showing the defendant's knowledge and ability to comprehend matters and intelligently discuss them with his defense attorneys.

The defendant stated that he told his defense lawyers of his struggle with the victim at the very first meeting at the jail in August, 2014. He also told them of the statement he gave to police. He told them about the blood that was drawn on the day of his arrest, August 15, 2014. If this meeting occurred approximately 72 hours after the arrest, he would have made these statements to defense counsel before the end of August 2014. (See pp. 46-48 of Vol. II, PCRA transcript). The defendant further stated that he told his attorneys of the video at the police station and of the witnesses who could confirm his intoxication at this first meeting. He also stated that he advised them that an analysis of his blood would confirm his intoxication. According to the defendant, the attorneys gave no response to these matters at that meeting. (See pp. 48-49 of Vol. II, PCRA transcript).

With regard to the struggle and theory of self-defense, defendant stated that he wanted to be clear in his discussions with his attorneys at this first meeting that he was not the aggressor. He told the attorneys that when he arrived home in the early morning hours of August 15, 2014, he asked the victim (Patricia Thompson) why she had left him at the bar and she immediately became aggressive. He told the lawyers that he never intentionally stabbed the victim. (See pp. 52-55 of Vol. II, PCRA transcript).

-17-

The defendant stated that he received discovery from his attorneys and read it at the jail. He stated that he advised the attorneys of the witnesses who could be called to testify at the suppression hearing and these witnesses were, in fact, in the courtroom during the hearing. (See pp. 56-60 of Vol. II, PCRA transcript). Once the suppression motion was denied, the defendant stated that he wanted these witnesses to be called at trial regarding the voluntariness of the statement because it was still an issue at that point, but the witnesses were never called at trial. (See pp. 63-66 of Vol. II, PCRA transcript). According to the defendant, Attorney Braslawsce stated, "Who's going to believe them." (See pp. 67 and 76-77 of Vol. II, PCRA transcript). The defendant also stated that, after reviewing the autopsy report, he advised Attorney Paganie that the wounds were superficial, indicative of a struggle. According to the defendant, Paganie did not respond. (See pp. 68-69 of Vol. II, PCRA transcript).

The defendant testified that he wanted scientific proof of his intoxication. He stated that he brought up these and many other points because he is an engineer who pays close attention to detail. (See pp. 72 and 77-78 of Vol. II, PCRA transcript).

The defendant stated that he made it known from day one that he was willing to testify. (See p. 84 of Vol. II, PCRA transcript). He wrote letters to his attorneys from the jail, and they wrote back. (See p. 90 of Vol. II, PCRA transcript). Defendant's attorneys filed motions to suppress and also filed a motion to quash the first degree murder charge. (See pp. 94-96 of Vol. II, PCRA transcript).

## GENERAL LAW REGARDING PCRA PETITIONS

Defendant contends that his trial counsel rendered ineffective assistance and that he is therefore entitled to either a new trial or dismissal of the charges against him. (See ¶16, p. 4 of defendant's Amended Petition for Post-Conviction Relief).

-18-

"It is well-established that counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him." *Commonwealth v. Koehler*, 36 A.3d 121, 132 (Pa. 2012) (citing *Strickland v. Washington*, 466 U.S. 668, 687-91, 104 S.Ct. 2052, _____, 80 L.Ed.2d 674, _____ (1984). The Pennsylvania Supreme Court set forth a three-part test to determine whether a defendant has received ineffective assistance of counsel, with those three parts being as follows: (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) the defendant was prejudiced by counsel's act or omission. *Koehler*, 36 A.3d at 132 (citing *Commonwealth v. Pierce*, 515 Pa. 153, _____, 527 A.2d 973, 975 (1987). The Court must analyze defendant's seven claims under these parameters.

## LEGAL ANALYSIS

The defendant's PCRA petition has raised seven claims. Those seven claims are as follows:

1. Trial counsel was ineffective for not objecting to certain expert testimony of James Smith, M.D.

2. Trial counsel was ineffective in that defendant was denied a full and effective cross-examination opportunity of the expert testimony of James Smith, M.D., as it related to the alleged unconsciousness of the defendant and the prone position of decedent while she was stabbed.

3. Trial counsel was ineffective for failing to request a charge regarding the involuntariness of defendant's action as it related to malice, a necessary element in proving third degree murder.

4. Trial counsel was ineffective for not objecting to that portion of the testimony of James Smith, M.D. where he

-19-

quoted from the autopsy report regarding manner of death and thereby allowed Dr. Smith to testify at trial that the manner of death was homicide.

5. Trial counsel was ineffective for failing to procure the testimony of available witnesses and in failing to preserve evidence to support the claim that the August 15, 2014 statement of the defendant was involuntary.

6. Trial counsel was ineffective for failing to preserve blood evidence or to request an adverse inference instruction due to the missing evidence.

7. Trial counsel was ineffective for failing to procure testimony of available witnesses and for failing to present character evidence of the decedent as permitted by Pa.R.Evid. 404.

These are the contentions on which testimony and evidence was received at the PCRA hearing and are the issues that will be addressed by the Court in separate subsections below.[3]

### 1. Defendant Alleges Trial Counsel Was Ineffective for Not Objecting to Certain Expert Testimony of James Smith, M.D.

Defendant complains that the forensic pathologist, Dr. James Smith, testified to certain matters that were not disclosed in the autopsy report. The defendant contends that this violated Pa.R.Crim.P. 573(E) and precluded the defendant from effective cross-examination of Dr. Smith. The defendant further contends that trial counsel's failure to object rendered counsel ineffective.

Specifically, Dr. Smith testified that the number of stab wounds in a small area of the neck indicated that the defendant was unconscious at the time of the stab wounds and that the defendant was moving about the victim when the stab wounds were inflicted, while the victim was unable to resist.

---

[3] Defendant raised other issues in his original *pro se* petition, but these are the seven issues, and the only real issues, pursued at the hearing.

Defense counsel Paganie acknowledged that there was nothing specifically in the autopsy report that stated that the victim was unconscious at the time that the stab wounds were inflicted. He stated that he did not object to the testimony because the wounds were not concentrated in a specific area. The wounds went from the lower back to the top of the head, the front of the head and neck area. Paganie stated that if the victim were truly knocked unconscious, there was no basis for wounds all over the body, and it was Paganie's belief that Dr. Smith's testimony and the location of the wounds was indicative of a struggle. Paganie cross-examined Dr. Smith on these issues. (See pp. 127-32 and 136-37 of Vol. I, Trial transcript).

This testimony of defense counsel clearly raises a matter of strategy and tactics. "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Commonwealth v. Howard*, 553 Pa. 266, _____, 719 A.2d 233, 237 (1998). The *Howard* Court also noted that a claim for ineffective assistance of counsel cannot succeed by simply comparing, by hindsight, the trial strategy employed with alternatives not pursued. "A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id.* Here, defendant did not establish that an alternative basis offered a potential for success substantially greater than the course chosen. In this case, it must be remembered that the defense was one of self-defense, with the defendant actually testifying to the events in question. The defendant's version of the events and the struggle was consistent with the multiple stab wounds throughout

-21-

the body of the victim, and there was a reasonable basis for defense counsel to take the position chosen.

Moreover, a careful review of the autopsy report entered into evidence as Exhibit E at the PCRA hearing reveals that it is a five-page document that details not only the final anatomical diagnosis in the first two pages, but also details the wounds and their locations in a three-page attachment. A similar case was presented in *Commonwealth v. Davido*, 630 Pa. 217, 242-43, 106 A.3d 611, 626 (Pa. 2014). In *Davido*, there was a PCRA petition filed on a similar basis. In that case, the Commonwealth's medical expert testified to certain matters not necessarily contained within his report. The Pennsylvania Supreme Court held that there was no discovery violation under Rule 573(E) and that the doctor's testimony should have been expected based upon the doctor's report. The same can be said here in light of a reading of the autopsy report and attachment. For this reason, defendant's petition on this basis will be denied.

2.     **Defendant's Allegation that Trial Counsel Was Ineffective for Failing to Effectively Cross-Examine James Smith, M.D. as it Related to the Alleged Unconsciousness of the Decedent and the Prone <u>Position of the Defendant When She Was Stabbed</u>**

In this contention, defendant raises many of the same allegations as raised in the first allegation for relief. It must be noted that defense counsel did cross-examine Dr. Smith on the basis that all of the wounds were not concentrated. (See pp. 127-32 and 136-37 of Vol. V, Trial transcript). Paganie's, and the defendant's, theory was that the wounds were not concentrated and it makes no sense to have wounds throughout the body inflicted upon someone who was unconscious, as opposed to two people engaged

-22-

in a struggle. The same discussion and logic set forth in the preceding section applies here, and the Court will deny defendant's petition on that basis.

3.      **Defendant Alleges Trial Counsel Was Ineffective For Failing to Request a Charge Regarding the Involuntariness of Defendant's Action as it Relates to Malice, a Necessary Element in Proving Third Degree Murder**

Defendant next alleges that his trial counsel was ineffective for failing to request the Court to charge the jury that the defendant could not be liable for third degree murder due to defendant's testimony and conduct in stabbing the victim after the altercation began and after the defendant and the victim fell to the floor. Defendant asserts that his conduct was involuntary and accidental, not sufficient to prove malice, a required element for third degree murder. Defendant relies primarily upon the Pennsylvania Superior Court decision in *Commonwealth v. Fierst*, 423 Pa. Super. 232, 620 A.2d 1196 (1993). In that case, the Pennsylvania Superior Court addressed a PCRA situation in which the defendant's alleged involuntary actions, as they related to malice necessary for third degree murder, were drawn into question because he suffered from seizures. The defendant was convicted of aggravated assault, vehicular homicide and third degree murder. The defendant was driving a car in a reckless fashion that resulted in the death of his passenger. *Id.* at 237, 620 A.2d at 1198. The Superior Court held that trial counsel was ineffective in that case for failing to request a jury charge that the defendant could not be guilty of third degree murder and aggravated assault because of his involuntary actions due to seizures that would not be sufficient to prove malice. The defendant was granted a new trial. *Id.* at 248-49, 620 A.2d a 1205-06.

-23-

This case is a far cry from *Fierst*. This case is factually distinguishable in that there was no evidence of seizures here.[4] Moreover, defense counsel Paganie asserted that defendant's theory was one of self-defense, and not involuntariness. As the *Howard* Court notes above, it is not sufficient for a defendant to succeed in a PCRA by simply comparing, in hindsight, the trial strategy employed with alternatives not pursued. 553 Pa. at _____, 719 A.2d at 237. The issue of involuntariness was factored into, and covered by, the asserted self-defense theory, and this claim by the defendant lacks merit. Accordingly, the petition will be denied on this basis.

4. **Defendant Alleges Trial Counsel Was Ineffective For Not Objecting to that Portion of the Testimony of James Smith, M.D. When Dr. Smith Quoted from the Autopsy Report Stating that the Manner of Death was Homicide**

In this case, Dr. James Smith, a forensic pathologist, testified that the manner of death was homicide. That statement is clearly contained in the autopsy report entered into evidence at the PCRA hearing as Exhibit E. *Webster's Dictionary* defines homicide as a person who kills another or a killing of one human being by another.

Defense Counsel Paganie testified that he did not object because he understood homicide to mean a killing, which is the definition referenced above. The statement, "the manner of death was homicide," is contained in the autopsy report. The forensic pathologist, Dr. Smith, was called to testify to the manner of death, which is required in

_____

[4] To the extent that defendant claims his intoxication renders his conduct involuntary, the law is clear that intoxication is not a basis to negate intent. *Commonwealth v. Graves*, 461 Pa. 118, 394 A.2d 661 (1975).

-24-

homicide prosecutions.[5] He was simply doing his job, and his report and his testimony at trial both gave reasons for this opinion.

The Court believes that this is a meritless position asserted by defendant and rejects it as a basis for ineffective assistance of counsel.

5. **Defendant Alleges That Trial Counsel Was Ineffective For Failing to Procure Testimony of Available Witnesses and in Failing to Preserve Evidence to Support the Claim that Defendant's August 15, 2014 Statement to the Police Was Involuntary**

Defendant asserts essentially three contentions in this argument. First, he argues that defense counsel was ineffective for not calling certain witnesses who allegedly observed defendant's state of intoxication before going to the police station on August 15. Second, defendant claims that counsel was ineffective for failing to preserve blood samples taken from him (defendant) on the date of his arrest that allegedly would have confirmed the level of his intoxication. Third, defendant claims that counsel was ineffective for failing to secure video surveillance from the Aliquippa police station to show the manner in which he walked into the police station on August 15, as evidence of his intoxication. The Court will address each contention below.

First, defendant claims that his trial counsel was ineffective for not producing the testimony of Lori Turner-Williams, Major Williams and Jamie Turner, either at the pre-trial motions stage or at trial to confirm defendant's level of intoxication. Defense counsel testified that he did not produce these witnesses because of their relationship with, and allegiance to, the defendant and because their testimony appeared rehearsed

---

[5] The Commonwealth is required to prove that the victim is dead, that the defendant killed her and that the killing was done with malice to prove third-degree murder. See 18 Pa.C.S.A. §2502(c) and *Pa. Suggested Standard Criminal Jury Instructions*, 15.2502C. Smith's testimony was relevant to that end.

-25-

to him. In hearing the testimony at the PCRA hearing, the Court noted that the witnesses testified to events in a very similar fashion. For example, both Lori Turner-Williams and Major Williams testified that the defendant was intoxicated, disoriented and confused on the day of the incident before going to the police station. They both testified that defendant consumed 40 oz. beers and pills. In fact, their testimony was so similar that the Court questioned whether it was rehearsed. Moreover, there were implicit inconsistencies within the testimony. For example, Lori Turner-Williams testified that her brother, the defendant, was so intoxicated at her residence that he was confused and disoriented. Major Williams testified to the same. Nevertheless, they both testified that while driving the defendant to his home from their residence while in this state, they stopped and bought him more beer. This defies logic in the Court's mind. Moreover, that testimony was inconsistent with Lori Turner-Williams testifying that Major Williams bought the defendant one 40 oz. beer while driving defendant home. Major Williams testified that he bought two 40 oz. beers. Further, Jamie Turner testified that he, Lori Turner-Williams, Major Williams and the defendant were all in the car when they drove the defendant to the police station. Lori Turner-Williams testified that she was not in the car at that point, but instead stayed behind at another residence.

Defense counsel testified that he did not believe these individuals to be credible and chose to go with the testimony of the defendant alone. There is reasonableness in this choice in light of the discussion above, and it should not be second-guessed under the *Howard* language and decision cited above.

Second, defendant challenges his trial counsel's effectiveness on the basis that counsel did not secure the vials of blood before they were destroyed at the Pennsylvania State Police Crime Laboratory. Defense attorney Paganie explained what he attempted

to do in that regard. He specifically stated that the blood was destroyed in late November, 2014 and there was not an opportunity to file pre-trial motions or discovery requests until after the defendant's arraignment in early December. The Court acknowledges that defendant testified that he advised attorneys Paganie and Braslawsce of the availability of this blood at a meeting in mid-August, several days after the incident in 2014. His claim is that counsel failed to take any steps to preserve the evidence between August and November of 2014. Defense counsel Paganie testified that he intended to challenge the destruction of the materials in a direct appeal of this case, but was denied that opportunity by defendant's insistence and voluntary and intentional decision to withdraw the direct appeal and pursue this PCRA. Given these circumstances, it cannot be said that defense counsel was ineffective in that regard.

Third, defendant testified that his counsel was ineffective for failing to secure videotape surveillance at the Aliquippa police station that would have revealed him stumbling and staggering into the police station before questioning. Attorney Paganie indicated that the video was requested, but was not available. This basis alone does not render counsel ineffective, and counsel did file a suppression motion challenging the statement on the basis of intoxication. Accordingly, the Court finds no merit in this contention and rejects it as well.

## 6. Defendant Alleges Ineffective Assistance of Counsel Due to Counsel's Failure to Preserve Blood Evidence or to Request an Adverse Inference instruction Due to the Missing Evidence

This again deals with the vials of blood secured from the defendant on the date of his arrest. The Court addressed this issue in the preceding section. Defense counsel did file a motion to quash the first degree murder charge on the basis of the missing vials of

blood. He also raised this issue in the suppression motion. Trial counsel stated his intention to pursue this on a direct appeal that he filed with the Superior Court. That appeal was withdrawn upon the insistence and direction of the defendant after an extensive and formal colloquy advising him (defendant) of his rights. Again, the Court finds no merit in this position and rejects it as a basis for ineffective assistance of counsel.

### 7. Defendant's Allegation that Trial Counsel was Ineffective for Failing to Procure Testimony and Available Evidence and to Present Character Evidence of the Decedent under Pa.R.Evid. 404

Finally, defendant alleges that trial counsel was ineffective for not calling Lori Turner-Williams and Major Williams as witnesses at trial to testify to a statement that the victim, Patricia Thompson, allegedly made in their presence. That statement was allegedly directed at James Turner in which Patricia Thompson stated "You ain't gonna kill me, I'm gonna kill you." Defendant also alleges that counsel was ineffective for failing to offer into evidence the contents of Aliquippa police reports regarding incidents involving the victim and also failing to put into evidence mental health records regarding the victim.

As to the statements and potential testimony of Lori Turner-Williams and Major Williams, defense attorney Paganie stated that he felt the testimony was rehearsed because it was identical. The Court agrees with that assessment. A review of the PCRA hearing transcript reflects that both witnesses said the very same thing in the very same manner. While this may be some evidence of the victim's intentions, there was no surrounding testimony as to the circumstances under which these statements were made. For example, there was no indication as to whether the victim was serious or

joking at the time. Moreover, the testimony almost seemed rehearsed when given at the PCRA hearing. Defense counsel Paganie said that he questioned the credibility of these statements and also considered the relationship of the witnesses to the defendant and their reasons for this testimony. In fact, attorney Paganie stated that Major Williams was too passionate about the case, giving rise to the inference that Attorney Paganie believed that Major Williams may say anything to assist his brother-in-law.

It must also be recalled that when Major Williams testified at the PCRA hearing, he became irate and confrontational with the Assistant District Attorney during his cross-examination. Williams had to be escorted out of the courtroom by the Sheriff. This exchange at the PCRA hearing gives credence to Attorney Paganie's assessment of Mr. Williams.

With regard to attorney Paganie's failure to present evidence of the two incidents in 2008 contained in Aliquippa police reports, Attorney Paganie stated that both incidents were not only remote, but also involved only damage to property and not harm to any individuals. This was a strategy decision by Attorney Paganie and must be viewed under the *Howard* standard set forth above. There is no indication that the use of this evidence, if admitted, offered a potential for success substantially greater than the course actually pursued.

With regard to the mental health records, Attorney Paganie gave a very valid reason for not using mental health records of depression, namely because they do not equate to aggression or violent propensities. For these reasons, the final contention of defendant in his PCRA petition is rejected.

## CONCLUSION

An Order consistent with this Memorandum Opinion will be entered this same date.

BY THE COURT:

_____ J.

JUDY R. ENSLEN
CLERK OF COURTS
18 JAN 30 PM 3: 29
BEAVER COUNTY
PENNSYLVANIA

2018 JAN 30 P 3: 09
JAMES J. ROSS
BY THE COURT